## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA,**

*v.*

**ASHISH BAHL,**

   *Defendant.*

**Case No. 3:17-cr-00202-BJD-JBT**

## SENTENCING MEMORANDUM

Defendant ASHISH BAHL files this memorandum to assist the Court in preparation for the sentencing scheduled for **10:00a**, on **February 1, 2018**.

On October 18, 2017, Defendant entered a plea of guilty to a single-count Information charging him with violation of 18 U.S.C. § 371. [Doc. 10]. By agreement Mr. Bahl was granted an Unsecured Appearance Bond and was released without any domestic or international travel restriction. [Docs. 11, 12].

This Sentencing Memorandum will explain why a non-incarcerative sentence is "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C.A. § 3553(a)(2).

> It has been uniform and constant in the federal judicial
> tradition for the sentencing judge to consider every
> convicted person as an individual and every case as a
> unique study in the human failings that sometimes
> mitigate, sometimes magnify, the crime and the
> punishment to ensue.

> *Koon v. United States*, 518 U.S. 81, 113 (1996).

## SENTENCING GUIDELINES[1]

### The PSIR Calculation

The PSIR, using the 2016 Guidelines Manual, calculates a Total Offense Level of 15, which, with the calculated criminal history (CH I), results in an advisory Guidelines range of 18-24 months. ¶¶ 40, 71.

The PSIR is congruent with the Plea Agreement except in the calculation of loss. The loss set out in the Plea Agreement would have resulted in an advisory Guidelines range of 12-18 months. Undersigned counsel believes that the agreed loss more closely reflects the actual loss suffered by the victim business owners. The Defendant's other concerns about the PSIR have been addressed in consultation with the Probation Officer and the Government.

---

[1] The usual pattern is for the Court to review the PSIR in light of any unresolved objections, correctly calculate the applicable Guidelines range under §3553(a)(4), consider arguments for departures, and then examine each of the other §3553(a) factors as a basis for variance. This Memorandum will follow that pattern.

## CONSIDERATION OF § 3353(a) FACTORS

### Circumstances and Characteristics

Under 18 U.S.C. § 3553(a)(1), a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." These factors show that a non-incarcerative sentence is appropriate for Mr. Bahl.

*Ashish Bahl's early life*

Ashish Bahl was born in Kenya to parents who were British citizens of Indian extraction. The family fled from Kenya to England and then to the United States to escape unrest and uncertainty caused by the actions of Idi Amin (neighboring Uganda's notorious leader). *See* Henry Unger, "We literally left all of our possessions in Kenya," *Atlanta Journal-Constitution* (Feb. 2, 2013) (attached as Ex. A).

Mr. Bahl spent the remainder of his childhood and his teenage years in the Pittsburgh area as "an average American kid," whose ethnicity was considered somewhat unusual (there were few Indians in the area). He attended Vanderbilt University, majoring in Mathematics and Electrical Engineering, and later took an MBA at Carnegie Mellon in Pittsburgh.

He was in the right place at the right time, with the right skill set (technology and business) and through 1997 he worked in various financial technology settings.

3

Thereafter he founded and was CEO of a series of financial technology businesses. His companies were acquired by established financial services companies in 1997, 2006, and 2017, in each instance leaving Mr. Bahl free to take on his next project. *See* Resume of A.K. Bahl (Jan. 17, 2018) (attached as Ex. B).

Until 2009, virtually all of his employment focused on the intersection of finance and technology. This case arises out of an ill-advised attempt to apply his skills in the field of commercial real estate, in which he had no prior experience.

*The nature and circumstances of the offense*

In 2009, the majority of the condominium units of the office building at 76 South Laura Street ("76 South Laura")[2] was available for sale. The prospective seller had foreclosed on the units, and was interested in divesting itself of this distressed property. Mr. Bahl and his partners became interested in purchasing these units.

The building had been built in 1989, and in the first years of the building's existence it was owned and operated as a conventional office building, with a single owner who leased space to various tenants. In September 2005, however, a developer had converted the building's ownership into a condominium structure, in which the charter owners owned various parts of the building (one or more floors,

---

[2]This building is referred to in the Plea Agreement as "the SunTrust Building," due to the identity of the anchor tenant and branding on the building exterior. SunTrust is not an owner of any part of the building, and was not directly involved in or impacted by any of the relevant events.

or one or more office suites, for example), and the building was operated by a Condo Association made up of the owners with voting power in accord with their ownership shares. The operation of the building was funded by regular monthly dues paid by the owners and special assessments as needed. While residential condominiums are common, this was an unusual business structure for an office building. The charter documents provided that the majority owner would control the Condo Association and the management company, and would also be in charge of property management and asset management.[3]

In late 2008, the majority owner's interest was foreclosed on by its lender JDI Laura Street, LLC. Thereafter, JDI owned 53.21% of the building and the remainder was owned by seven minority owners, none of which controlled more than 19% of the building. JDI installed a management company and began to seek a buyer for its controlling interest.

There were significant obstacles to a sale, including: the condominium structure itself; the fact that the building was only about 40% leased; the lack of available parking for tenants; and a history of poor management. The building was known to be on shaky financial ground. These problems raised serious concerns for prospective

---

[3]Property management is concerned with operations ("Are the elevators working today?" "Is the lobby clean and attractive?" "Are we able to pay the bills?"), but asset management is concerned with creating long-term value in the asset ("How are we able to attract new tenants in the next five years?" "What infrastructure upgrades will be necessary to serve the tenants of the building?" "How do we make 76 South Laura a Tier 1 office tower?")

buyers, but also created an opportunity for an investor who could turn the building around.

It was in this context that Parador Partners LLC was formed for the express purpose of buying JDI's interest in the building and addressing these problems. Mr. Bahl was the managing partner of Parador, and he was tasked with overall responsibility for the management of the entity's investment in the building.

Though not experienced in commercial real estate, Mr. Bahl believed himself to be well-prepared by his prior business background for the task of turning the building around. He was experienced in working through business transitions and adding value to existing entities, as he had previously taken troubled or undervalued assets and had solved their problems and re-marketed them. Though none of these prior businesses were real estate concerns, he expected that his experience would be directly relevant to the project.

In late 2009, Parador Partners purchased JDI's 53.21% interest in the building. Parador planned to put the building back in shape and run it efficiently, with the purpose of getting it ready to sell to an investor who would take it "out of condominium" by purchasing all the ownership interests. Such a sale would inure to the benefit of Parador and the other building owners, though it could come only after a significant financial risk for Parador.

Parador became the majority owner on October 1, 2009 and maintained this role through the eventual sale to MainStreet at the end of the first quarter of 2015.[4] As soon as Parador became responsible for the management of the building, it became clear to Mr. Bahl that the problems were greater than he had anticipated.

First, the building had long been seen as a distressed property in the community, and that perception was extraordinarily hard to change. *See, generally,* Ashley Gurbal Kritzer, "Tower Troubles," *Jacksonville Business Journal* (Dec. 14, 2012) ("The SunTrust Tower, one of Downtown's signature high-rises, could be on the verge of overcoming issues that have plagued it for years: A lack of parking and ownership complications stemming from the building's conversion into commercial condominiums in 2005.") (attached as Ex. C). Any prospective tenant would have had cause for concern about signing a lease, and a prospective investor would be concerned that it was purchasing a failing property.

Second, the available parking was inadequate. Unlike Washington, New York, or Chicago, there is no comprehensive public transit in Jacksonville — so any tenant moving in would want to know where its employees would park. The lot next door (a) was not owned by the Condo Association, (b) was only partially paved and,

---

[4]Initially, Parador owned 53.21% of the building. Later acquisitions brought its total to 73.83%.

(c) at 200 spaces, had less than one-third of the necessary parking for a 300,000 sf building.

Third, the building had not been well managed. JDI, as the reluctant majority owner of the Condo Association, had acquired responsibility for both property management and asset management in the fall of 2008 and had hired a commercial property manager, but there was not a comprehensive set of historical records for the Condo Association and there were numerous issues with the physical plant.

Finally, the Condo Association was suffering from serious cash-flow issues, primarily as a result of the failure of some owners to pay their legitimate dues and assessments. Although the delinquency problems were known in part, they were worse than expected.

Even with these significant problems, it seemed that a sharp and forceful majority owner could be successful if it could (1) upgrade the common areas and assure that the physical plant was in good shape, (2) secure adequate nearby parking by building a new parking garage, (3) attract new tenants by providing them with a well-run building, and (4) straighten out the financial situation of the Condo Association.

Some of these were property management issues and some were asset management issues, but as majority owner, Parador had a large degree of practical

control of all of them. It also bore practical responsibility for the financial well-being of the building. If minority owners were (or became) unwilling or unable to pay their dues and assessments, then Parador would have to make up any shortfall in order to protect its investment. Indeed, over the next two years, unpaid dues and assessments from certain minority owners would exceed well over $1 million.[5]

Parador took costly steps to ameliorate the parking problem, first by itself purchasing the surface lot next door and then by negotiating with the City to get the necessary permits and incentives to build a modern parking garage (with retail street-level space) on the lot. This was important to the City, which had a responsibility to provide additional parking at the Landing. In 2013, Parador hired a contractor to build the parking garage. The total cost to Parador for the finished parking garage was approximately $9 million, which ultimately became (in practical effect) a common asset of the Condo Association at the time of the 2015 sale to MainStreet.

In 2011, though, the possibility that the building could be sold out of condominium was still merely a dream. The prevailing mood for Parador and the other participating owners was of deep concern. These concerns were exacerbated when it was discovered that mold existed on a floor which belonged to an owner delinquent in its dues. This problem need to be remediated, though initially it was unclear

---

[5]Attempts to persuade delinquent owners to bring their accounts current were largely unsuccessful.

whether the mold impact was limited to a single floor or whether it reached into other parts of the building.

It was in this context that Mr. Bahl made the most foolish decision of his life. Frustrated with the rising dues delinquencies, the growing costs of the parking garage which Parador was shouldering, and other financial pressures, he elected to engage in a fraudulent scheme which would exaggerate the cost of the remediation of the mold in collection of a special assessment. The purpose of this exaggeration was to acquire what he believed to be a "fairer" contribution from the delinquent owners.

The special assessment, approximately 70% of which was in fact paid by Parador, went to pay for actual cost of the remediation, with the excess secretly "rebated" to a company controlled by Mr. Bahl. The scheme cost the other owners slightly less than $30,000 in total (their contributions less their pro rata share of the actual mold remediation done).

A similar event occurred at a later time with regard to a special assessment for window seals. By that time, however, Parador's share of the collected special assessment was well over 90% of the total, so again the loss to the other owners was slightly less than $30,000 in total.

Finally, as described in the plea agreement, there were two personal expenses charged to the condo association which should properly have been paid for by Bahl himself. In these, the other owners improperly paid less than $10,000 as a result.

Mr. Bahl was foolishly short-sighted. His actions were the product of his frustration as the managing partner of a 53% owner who was (as he conceived of it) being forced to shoulder over 90% of the expenses. The total loss to the other condo owners as a result of his actions was less than $70,000.

As a matter of accounting, the losses were reversible, and in the 2015 sale of the building the other owners were more than made whole.[6] This was accomplished in two ways. Prior to the closing, estoppels totaling $46,724.73 were issued to the minority owners for refunds of the special assessments. Additionally, in MainStreet's due diligence, it had become clear that the five final owners each owed a pro rata share of a pre-2009 $617,804.33 lease commitment. Of this, $161,668.65 was the responsibility of the owners other than Parador. Parador paid the entire amount and the building (and parking garage) passed free and clear to MainStreet. The total paid to or on behalf of the minority owners through estoppels and this credit was $208,393.38.

---

[6] This sale was under way well before the Government investigation was known to Parador or Mr. Bahl. The closing occurred after he became aware of the Government's interest.

In 2009, when Parador bought a majority share in the building, it had done so at a cost of approximately $37/sf for the 160,475 sf it purchased. At closing in 2015,[7] the five owners received an average of $103/sf for their shares, for a total of over $31 million,[8] due to the work done under the leadership of Parador and Mr. Bahl, including the construction of the parking garage. Except for the fact that it is being described in this context, it was a successful turn-around of the building. Indeed, today, the building is considered a Tier 1 office tower in Jacksonville. Of course, success in the business venture in no way atones for Mr. Bahl's fraudulent behavior, though it mitigated the damage to the other owners.

*History and characteristics of Mr. Bahl*

Mr. Bahl is characterized by those who know him well not only as a visionary executive who has had great success in the financial technology field, but also as a man dedicated to his family and his community. *See generally,* character letters submitted under separate cover.

Mr. Bahl has been married twice and has four children. His two older children are in their twenties and his two younger children are 11 years old. His oldest son has graduated from University of California at Berkeley (majoring in

---

[7] Because there were multiple owners, there were multiple closings when MainStreet became sole owner of the building and parking garage in April 2015.

[8] The range was from $90/sf for Parador to $179/sf for one of the co-owners. No separate payment was made for the parking garage.

bioengineering), and is currently employed in healthcare management consulting
with Accenture. His daughter is majoring in finance and economics at Barnard
College in New York City. His younger children, twin boys, reside in Atlanta. He
has had a close relationship with each of them throughout their lives.

His charitable and community involvement has been significant, including
years of service on the boards of Leadership Atlanta (*www.leadershipatlanta.org*), the
Fernbank Museum of Natural History in Atlanta (*www.fernbankmuseum.org*), and
Kate's Club (*katesclub.org*). With his time and money, he has worked on behalf of
Autism Speaks (*www.autismspeaks.org*), and has been a supporter of the Atlanta
Opera (*www.atlantaopera.org*).

He has also served on the boards of non-profit entities that are focused in the
area of technology, such as Techbridge (*techbridge.org*), "a nonprofit that arms other
nonprofits on the frontline of alleviating the causes of poverty with technology that
will allow them to expand the impact of their mission for the millions of men,
women and children who suffer from lack of access to shelter, food, employment,
education, healthcare, and financial literacy." *See* "About Us," Techbridge website
(*techbridge.org/about-us*). In a similar vein, Mr. Bahl has been deeply involved as a
board member and mentor for TiE Global (The Indus Entrepreneurs, *tie.org*), which
seeks to foster entrepreneurship.

Notwithstanding the circumstances which have brought Mr. Bahl before the Court, those who know him well report on his business ethics in glowing terms. They describe him as "forthright and direct," "honorable and ethical," a man who "look[ed] out for all the building's owners," "a good person with the potential to do so much more good for the community," "a person of focus and drive, extraordinary talent, and importantly, good character," "loyal to a fault, honest," "a person of conviction and introspection," someone who is "focused on making a positive difference in his community," "a steward of community values," and a man who is known for his commitment "to do the right thing."

A non-incarcerative sentence would be "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C.A. § 3553(a).

### Respect for the Law and Deterrence

Under § 3553(a)(2), the sentencing court must also consider

the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed
educational or vocational training, medical care, or other
correctional treatment in the most effective manner.

Mr. Bahl deserves consequences for his actions. Nevertheless, the mere fact of the investigation and Mr. Bahl's acceptance of responsibility and plea have demonstrated to him and to others the seriousness of the offense and have provided significant punishment already.

The embarrassment and shame of the investigation have taken a serious toll on the defendant and his family. Unfortunately, this case and various other strains on the relationship have led to divorce proceedings with his wife. He has lost his marriage and his time with his young children will therefore be less than it was.

Mr. Bahl has also lost his employment since news coverage of his plea.[9] His opportunity to acquire financing and work in the financial technology field has been severely curtailed. This conviction will make it much more difficult for him to use his talents and skills in the future.

As a part of his Plea Agreement, Mr. Bahl has also voluntarily agreed to pay a sum of $135,396.06 in forfeiture. Plea Agreement at 10.

Mr. Bahl has suffered unusually serious personal, business, and financial consequences as a result of his decision to accept full responsibility and plead guilty

---

[9] He continues to work on his LogMatrix business as Chairman and CEO.

to this felony. In light of these facts, a non-incarcerative sentence would be "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C.A. § 3553(a).

## Available Sentences

Under § 3553(a)(3), the sentencing court must also consider "the kinds of sentences available." In this case, particularly because of the non-violent nature of his crime, consideration of an alternative sentence is appropriate. Under the pre-*Booker* Guidelines, certain sentencing options—such as home detention, community confinement, or intermittent confinement—were only available if the calculated sentence was within Zone A or B, unless the sentencing court elected to make a downward departure.

After *Booker*, courts gained further discretion to make so-called "lateral" departures, which go to the conditions of confinement rather than the length of time, where appropriate circumstances warrant such treatment. The Supreme Court has long rejected the idea that a non-custodial sentence is necessarily "lenient," however. *See Gall v. United States*, 552 U.S. 38, 48 (2007)(upholding sentence of probation where PSIR had calculated sentencing range under advisory Guidelines of 30-37 months).

For Mr. Bahl, a fine on top of the agreed-upon forfeiture might be quite appropriate. Alternatively, or in addition, the Court may consider requiring community service in one of the areas in which Mr. Bahl has expertise, such as tech consulting for non-profit entities; mentoring of young entrepreneurs; or teaching a class at the university level on entrepreneurship. Such a sentence would provide significant benefit to the community. Such a non-incarcerative sentence would meet the goals of 18 U.S.C. § 3553(a).

### Other Statutory Factors

Under § 3553(a)(5), the sentencing court should consider "any pertinent policy statement" issued by the Sentencing Commission (or otherwise in effect). Undersigned counsel is aware of no such policy statements.

Under § 3553(a)(6), the sentencing court must also consider "the need to avoid unwarranted sentence disparities" among similarly-situated defendants. This factor does not weigh against the imposition of a non-incarcerative sentence.

Under § 3553(a)(7), the sentencing court must also consider "the need to provide restitution to any victims of the offense." In the present case, there is no restitution owed, as restitution was made before the present case was filed.

## SUMMARY

In summary, there are numerous factors which suggest that a non-incarcer-ative sentence is appropriate:

- Mr. Bahl cooperated with the government from the beginning of the investigation, including by engaging in detailed analysis of the business.

- Mr. Bahl took prompt steps to repair the damage he had done by making restitution at the time of the building closing in 2015.

- Mr. Bahl has demonstrated full acceptance of responsibility for the offense by waiving indictment and entering a plea to an information.

- Since the public news coverage of the plea, Mr. Bahl has suffered very damaging business consequences from which he may never recover.

- Based on Mr. Bahl's spotless prior record, there is absolutely no reason to anticipate that Mr. Bahl would reoffend.

- The circumstances which led to the offense conduct were unusual and there is absolutely no expectation that Mr. Bahl would commit any future offense.

- Finally, Mr. Bahl's actions have cost him his marriage and will continue to impact his relationship with his children for the remainder of his life.

In light of these considerations, a non-incarcerative sentence would be "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C.A. § 3553(a).

## CONCLUSION

Mr. Bahl therefore requests that the Court impose a non-incarcerative

sentence.

DATED at Jacksonville, Florida this 18th day of January, 2018.

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE

Professional Association

By:  s/O. David Barksdale
_____

O. David Barksdale
Florida Bar No. 957331
*odb@bedellfirm.com*
Allan F. Brooke II
Florida Bar No. 994413
*afb@bedellfirm.com*
101 East Adams Street
Jacksonville, FL 32202
(904) 353-0211
(904) 353-9307 Facsimile

Attorneys for Defendant Ashish Bahl

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been delivered by using the CM/ECF system
which will send a notice of electronic filing to the following:

Mark B. Devereaux, Esquire
Special Assistant U.S. Attorney
United States Attorney's Office
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202-4270
*Mark.Devereaux@usdoj.gov*

By:  s/O. David Barksdale
_____

O. David Barksdale

*Exhibits*

A.   Henry Unger, "We literally left all of our possessions in Kenya," *Atlanta Journal-Constitution* (Feb. 2, 2013)

B.   Resume of A.K. Bahl (Jan. 17, 2018).

C.   Ashley Gurbal Kritzer, "Tower Troubles," *Jacksonville Business Journal* (Dec. 14, 2012).

☰    my**AJC**
from The Atlanta Journal-Constitution          LOG IN 👤

## *'We literally left all of our possessions in Kenya'*

**BUSINESS**

By Henry Unger - The Atlanta Journal-Constitution
Posted: 6:26 p.m. Saturday, Feb. 2, 2013

Scoring big as an entrepreneur is rare. Doing it more than once is rarer.

Luck can help, and so does having some sharp business insights.

**Ashish Bahl**, a self-described serial entrepreneur, is on his third financial tech firm. He sold his first after only a few months to iXL (no longer exists) and his second for about $150 million to American Express.

His current company, Atlanta-based Acculynk, has a patented system enabling online consumers to pay a growing number of businesses by entering a secure PIN when they use their debit card — just like at an ATM. The technology — an online PIN pad — scrambles the numbers so they're not intercepted during transmission.



Bahl, 47, had an unusual childhood, fleeing Kenya with his parents during a troubled time. He discusses what happened, as well as how he became an entrepreneur and what he's learned.

**Q: You came to the United States under unusual circumstances. Would you please discuss?**

Ashish Bahl, AccuLynk

A: At the ripe old age of 7, I was put on an airplane in Kenya with my parents — my dog and my toys left behind — to go to the United Kingdom.

I was completely shocked about being uprooted. The reason was (Ugandan leader) Idi Amin had been spreading a very nationalistic doctrine. There was fear that the uprisings and killings would spread to neighboring nations, like Kenya.

British citizens in Kenya were worried. We were British citizens. I was born in Nairobi. My father, a doctor, was born in Nairobi. His parents were born in India. They went to Kenya seeking a better life.

But being risk averse, my father said, "We can get a flight out and we're all leaving." We literally left all of our possessions in Kenya and flew to England, which was our staging ground. After a year, we showed up in the United States, settling in Pittsburgh.

**Q: Was it hard to adjust?**

A: The English school system is very rigid. You've got your gray wool pants, your white oxford shirts and your blue blazers.

Then you move to Pittsburgh, home of the Steelers, where everyone is in jeans and T-shirts. So you look like an oddity when you show up. In my Italian neighborhood of Pittsburgh in the mid-1970s, they didn't know what an Indian was. They thought we were Sicilians with British accents who dressed funny.

I learned at a young age how to adapt, how to listen, how to persevere. It's helped me a lot.

I became an average American kid. But there was an immense pressure, because of my Indian background, to succeed academically. The reason for that is that Indians who tend to leave India are often the best and the brightest. They're the ones who can get out. So education-wise, there was tremendous pressure for me to knock it out of the park.

**Q: How did that play out when you were choosing a career?**

Henry Unger, "We literally left all of our possessions in Kenya," *Atlanta Journal-Constitution* (Feb. 2, 2013) (www.myajc.com/news/business/we-literally-left-all-of-our-possessions-in-kenya/nWs5n) accessed 02/17/2016).

EXHIBIT A

A: I was getting pushed hard by my father to pursue a medical career. Back then, he thought you were either a doctor or you were a nobody. But being ADD, I didn't have the patience to pursue a medical career.

I majored in engineering at Vanderbilt, but I'm not detail oriented. At the time, I was completely intrigued by Wall Street. After graduating, I worked there in a financial training program for a year. Then I went back to Pittsburgh to become a stock analyst for an investment firm by day, and get my MBA at Carnegie Mellon at night.

I then became a management consultant in Atlanta in financial services. A-year-and-a-half into it, everything happened for me.

**Q: What happened?**

A: As a consultant, I was working for the chief information officer for Wells Fargo. He wanted to know what the bank needs to invest in as the Internet comes of age. This was 1995.

I gave him six ideas. He said I could do one of the ideas and Wells Fargo would be my first client. He would give me a $1.5 million project.

You've got to be at the right place at the right time. You've got to be able to engage people. You've got to establish an element of trust.

My idea was that financial services will be transformed by the Internet. Companies are going to have to put all their products on the Web and have real-time quotes. Banks are going to have to do bill payment on the Web, etc.

I started my business with a big contract from Wells Fargo. I shed the risk aversion from my father. I had a very different DNA. I did not want to end up in a small, enclosed world.

I was getting big contracts. But I was only independent for 60 to 90 days when I got an offer to merge with a bigger firm, iXL, which I did.

**Q: You left iXL before it got into trouble during the dot-com bust in 2000-2001 and started another company that did electronic invoicing for businesses. You then sold that company, Harbor Payments, to American Express in 2006. You're now building up a third company, Acculynk, in the financial technology sector. What's a key lesson?**

A: In technology, there's a tremendous war for talent. Often, you cannot hire enough good people to sustain growth or quality.

But if you can have a business with very few key individuals, all playing critical roles, largely dependent on patents and a data center, your risk is substantially mitigated and your stress level is, too.

In my electronic invoicing business that I sold, it did not require incremental humans for growth. It required capital and a big data center.

In the consulting business, you can only grow the revenue if you have more humans. But in a transaction processing business, the growth is not commensurate with humans. You set up the infrastructure and bring on clients. If you build your product properly, if it's scalable, you can grow exponentially.

We never go into commodity markets. We look for things through patents or specialized products that make us highly differentiated. It's not my personality to set up a me-too company.

*Bahl's remarks were edited for length and style.*

Henry Unger, "We literally left all of our possessions in Kenya," *Atlanta Journal-Constitution* (Feb. 2, 2013) (www.myajc.com/news/business/we-literally-left-all-of-our-possessions-in-kenya/nWs5n) accessed 02/17/2016).

# Ashish K. Bahl

## RECENT EXPERIENCE

**LogMatrix** – Jacksonville, Florida

Chairman & CEO                                                    October 2016 -- present

LogMatrix offers network and system management solutions for predictive monitoring of services and resources.

**First Data Corporation** – Atlanta, Georgia

Executive Vice President, Acculynk Division                       May 2017 – October 2017

Became EVP of the Acculynk Division after Acculynk's acquisition by First Data.

**Acculynk** – Atlanta, Georgia

Chairman & CEO                                                   September 2008 – May 2017

Acculynk is a provider of patented software solutions for processing pin debit transactions within an online environment.

**American Express** – New York, New York

Senior Vice President                                            January 2007 – June 2008

General Manager of EReceivables business unit which encompasses electronic billing solutions (EBPP) and electronic invoicing solutions (EIPP).

**Harbor Payments** – Atlanta, Georgia

Founder & CEO                                                   January 2000 – December 2006

Harbor Payments is a global provider of on-demand billing and invoicing solutions to the Fortune 1000. Harbor Payments was acquired by American Express in 2006.

**iXL** – Atlanta, Georgia

Senior Vice President & General Manager                         December 1997 – December 1999

Full P&L of iXL's Financial Services Practice Group.

**Exchange Place Solutions** – Atlanta, Georgia

Senior Vice President                                           January 1997 – December 1997

Information services company focused on assisting incumbent Financial Services Organizations to leverage the internet for Electronic Billing, Home Banking, and other financial applications. EPS was acquired by iXL in 1997.

## EDUCATION

**Carnegie-Mellon University** – Pittsburgh, Pennsylvania

Masters of Business Administration (MSIA), May 1990

**Vanderbilt University** – Nashville, Tennessee

Bachelor of Engineering, May 1986

Majors: Electrical Engineering & Mathematics

## MEMBERSHIP *and* SERVICE

Leadership Atlanta, Techbridge, TiE, FernBank Museum of Natural History, Technology Association of Georgia, Kate's Club, Autism Speaks, Friends of The Atlanta Opera

EXHIBIT B



**Tower troubles: SunTrust Tower owner clearing up complications**

Dec 14, 2012, 6:00am EST Updated Dec 14, 2012, 7:28am EST
Ashley Gurbal Kritzer Reporter
http://www.bizjournals.com/jacksonville/print-edition/2012/12/14/tower-troubles.html (accessed August 19, 2015).

JACKSONVILLE — The SunTrust Tower, one of Downtown's signature high-rises, could be on the verge of overcoming issues that have plagued it for years: A lack of parking and ownership complications stemming from the building's conversion into commercial condominiums in 2005.

The majority owner of the office tower, Atlanta-based Parador Group, recently acquired 60,000 square feet in the building, bringing its total holdings to 250,000 square feet. More than half of the 23-story, 383,000-square-foot building on South Laura Street across from The Jacksonville Landing sits vacant, but Parador is finalizing plans with the city to build a parking garage next to the tower. Having a designated parking garage, Parador ownership has said, is key to attracting office tenants to the tower.

Providing parking for and consolidating the condominiums in the SunTrust Tower could put the building back on the radar of commercial real estate brokers, who say the complications facing the building have long kept it from being a viable option for office users. But as the SunTrust Tower re-emerges as a potential player, it will mean more competition in an office market that's already brutal for property owners.

"That building has been virtually off the market for most tenants for several years now," said Joe Ayers, a senior associate with CBRE Group Inc. in Jacksonville. "And that has benefited the surrounding landlords."

Parador's plans

At the end of November, Parador took title to

several condo units that were previously owned by Sambr Investments LLC and Abab Investments Inc.

Florida Community Bank NA, the lender on those units, had filed foreclosure lawsuits against Sambr and Abab.

Parador acquired three notes from Florida Community Bank to take title to the space, according to public records: $630,000 for a $2.78 million note; $881,179 for a $5.36 million note; and $288,820 for a $1.7 million note.

"My goal is to acquire all of the space or make sure the space I don't have [that] I've got individuals carrying their fair share," Parador Principal Ashish Bahl said.

He said Parador has "a series of marquee tenants" lined up, including a financial services firm and a mobile consulting company. He declined to elaborate.

Bahl wouldn't say whether he plans to make a play for the office condos owned by Trimurti Investments Inc. Orlando-based Trimurti — owned by the same principals as the now-defunct Sambr Investments — filed for Chapter 11 bankruptcy in April.

Justin Luna, the Orlando bankruptcy attorney representing Trimurti, said the firm and its six creditors reached an agreement, and a confirmation hearing was scheduled for Jan. 10.

Luna said the Trimurti principals were planning to retain ownership of their share of the tower. The bankruptcy plan filed Nov. 16 details its repayment plan to the six creditors.

EXHIBIT C

Fifth Third Bank is the lender on Trimurti's space in the tower and is owed a total of $8 million on two notes.

SunTrust Banks Inc. (NYSE: STI), whose lease expires in 2019, is Trimurti's tenant. Trimurti is not to make any changes to its existing leases or enter any new leases without Fifth Third's consent.

Parador's tenants include Humana Inc. and law firm Morgan & Morgan.

State of the market

Earlier this year, Grubb & Ellis/Phoenix Realty Group Principal Jim Sebesta described the Downtown Jacksonville office leasing market as "hand-to-hand combat" on every deal.

"There are a lot of landlords with vacancy, so every deal that has credit attached to it is going to be fought over very, very hard," Sebesta said in April.

That hasn't changed. EverBank Financial Corp. (NYSE: EVER) moved 1,500 back-office employees from a suburban office park into 270,000 square feet of the former AT&T Tower at 301 W. Bay St. and renamed that tower EverBank Center.

That move, combined with several smaller tenants' moves into the urban core, lowered the office vacancy rate from nearly 25 percent to 21 percent, according to data from CBRE.

But EverBank's watershed lease was finalized in late 2011, and little else has occurred since in either Downtown or the suburbs. Office leasing activity serves as a barometer of business confidence, as companies harboring economic uncertainty typically don't move or expand their operations.

At 54 percent vacant, the SunTrust Tower is in good company: One Enterprise Center, at 225 Water St., is about 60 percent vacant. Both the Bank of America Tower at 50 N. Laura St. and the EverBank Center are about 30 percent vacant.

Wells Fargo Center, at 1 Independent Drive, is about 8 percent vacant, after Wells Fargo NA consolidated its offices there, moving employees out of One Enterprise and 1301 Riverplace Blvd., a Southbank office tower.

Colliers International of Northeast Florida is marketing two office condos for lease on the eighth floor of the SunTrust Tower for $13 per square foot, according to a July flier from the firm.

Average asking office lease rates in top-tier properties in the urban core are between $18 and $19 per square foot, according to third quarter data from Cushman & Wakefield of Florida Inc.

But Bahl said he isn't concerned with the glut of space on the Jacksonville office market. He sees potential for Downtown revitalization efforts to gain traction this time around.

"Downtown Jacksonville has historically had a lot of issues and morale problems, and the ecosystem morale is driven by local business, local brokers," Bahl said. "Frankly, we don't need to deal with 'Oh, the sky is falling.'

"We're full-speed ahead and will hopefully lead by example and the local participants of the office ecosystem will either get it or keep doing the same thing."

*Ashley covers real estate for the Tampa Bay Business Journal.*